UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

SEITHER & CHERRY QUAD
CITIES, INC.,                                          Case No. 23-11310

       Plaintiff,                                  F. Kay Behm
v.                                                     U.S. District Judge

OAKLAND AUTOMATION, LLC,
*et al.*,

       Defendants.
_____ /

and

AP ELECTRIC, INC.,

       Plaintiff,                                  Case No. 23-11342

OAKLAND AUTOMATION, LLC,                               F. Kay Behm
*et al.*,                                              U.S. District Judge

       Defendants.
_____ /

**CONSOLIDATED OPINION AND ORDER DENYING
DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT
(*Seither & Cherry*, ECF No. 64; *AP Electric*, ECF No. 74)**

This consolidated opinion and order is issued in two separate

cases filed against Defendants Oakland Automation, LLC ("Oakland

Automation" or "OA"), Oakland Industries, LLC ("OIL"); Oakland

Industries Blocker Corp. ("OIB"); and Interclean Equipment, LLC

1

("Interclean").  While the facts of these cases differ slightly, they arise from similar situations and involve overlapping issues of law.  As such, they have been consolidated for the purpose of issuing this opinion.

These cases arise from two related disputes regarding Defendants' alleged misappropriation and transfer of Oakland Automation's assets for Defendants' benefit.  Essentially, Plaintiffs allege that, although Toyota paid OA for contract work that Plaintiffs performed at Toyota plants, Defendants (alleged to be alter egos of one another) conspired to have OA fraudulently transfer or convert those funds to OIL and OIL's other subsidiaries, while failing to pay Plaintiffs for their contract with OA.

The first case, *Seither & Cherry v. Oakland Automation*, 23-11310 ("*Seither & Cherry*"), was filed on June 1, 2023.  *Seither & Cherry*, ECF No. 1.  The second, *AP Electric v. Oakland Automation*, 23-11342 ("*AP Electric*"), was filed on June 5, 2023.  *AP Electric*, ECF No. 1. Defendants OIL, Interclean, and OIB (the "Moving Defendants") filed motions to dismiss under Rule 12(b)(6) on March 19 and 20, 2024. *Seither & Cherry*, ECF No. 37; *AP Electric*, ECF No. 39.

The court granted those motions in part and denied them in part, dismissing Counts III (promissory estoppel), IV (unjust enrichment), V

2

(fraud), and X (corporate veil piercing as a separate cause of action) as to the Moving Defendants, but denying the motions as to Counts VI (Michigan Uniform Voidable Transactions Act), VII (Michigan Building Contract Fund Act), VIII (statutory conversion), IX (common law conversion), and XI (civil conspiracy for any or all of counts VI-IX).  The motions to dismiss did not address Counts I and II, which were brought only against Oakland Automation.

The Moving Defendants now bring motions for summary judgment on the remaining claims against them.  *AP Electric*, ECF No. 74; *Seither & Cherry*, ECF No. 64.  Both motions are fully briefed, and the court held argument on the motions on July 30, 2025, at which counsel for all parties appeared.

For the reasons below, the court **DENIES** the motions.

## I.    FACTUAL BACKGROUND

### A.    Facts Common to Both Cases

Seither & Cherry Quad Cities, Inc. ("S&C" or "Seither & Cherry") is an Iowa corporation with its principal offices in Davenport, Iowa. *S&C*, ECF No. 64, PageID.1354.  AP Electric, Inc. ("APE" or "AP Electric") is a Kentucky corporation with its principal offices in Louisville, Kentucky.  *AP Electric*, ECF No. 74, PageID.1118.

Both cases were brought against the same four Defendants: Oakland Automation, OIB, OIL, and Interclean.  Plaintiffs generally allege that Defendants and non-party Autotac are "substantively divisions of [the] merged entity doing business as 'Oakland Industries,'" which "manufactures auto cleaning equipment for the automotive industry."  *S&C*, ECF No. 31, PageID.423; *AP Electric*, ECF No. 32, PageID.252.  Plaintiffs argue that Oakland Industries (OIL) held itself out to Plaintiffs and the public as a single company.  Plaintiffs allege that OIL operates as the employer for employees at Interclean, OA, and Autotac.  *S&C*, ECF No. 68, PageID.2046.  Plaintiffs allege that Defendants "conflated, consolidated and integrated their business operations," including commingling business management, ownership, and control, merged and integrated financing, consolidated accounting and bookkeeping, shared employees and resources, and disregard for the corporate form.  *See Seither & Cherry*, ECF No. 31, PageID.422-23; *AP Electric*, ECF No. 32, PageID.252-53.

Defendants allege that OIL is the holding company for Interclean, OA, VSII, and Autotac.  OIL is the sole member of each of those entities. *S&C*, ECF No. 64, PageID.1354.  Interclean, OA, and Autotac are automation companies, and each makes distinctive automation

4

equipment. *S&C*, ECF No. 64, PageID.1354. VSII builds industrial control panels. Interclean makes automated systems for vehicle wash systems. OA performed robotic integration for aerospace companies and in automotive paint shops. Autotac made cleaning equipment that was used in automotive paint shops. *S&C*, ECF No. 64, PageID.1354-55. These companies had different customers (or at least, while OA and Autotac sometimes had the same customers, they sold different products to those customers). *Id.* at PageID.1355. Each of the companies had some common officers during certain periods, such as Greg Harvey as CEO, and Kris Morris as CFO. *Id.* The Moving Defendants argue that each of the companies had its own employees and kept separate accounting; Plaintiffs dispute that and say that the companies "commingled" both employees and financial accounts. *Id.*; ECF No. 68, PageID.2047.

As a whole, Plaintiffs argue that Defendants' actions were intended to induce various vendors, including S&C and AP Electric, into entering into contracts with Oakland Automation, and performing services for payments that Defendants knew Oakland Automation would not perform as promised, enriching and benefiting Defendants.

5

Defendants allege that their nonpayment is explainable by the fact that they paid a secured creditor.  On December 16, 2016, OIL, Interclean, Autotac, and OA signed a credit agreement with Northstar Bank for a revolving line of credit.  It began as a $1 million revolving line of credit, and later increased to a $4 million revolving line of credit.  Part of the Northstar Credit Agreement included a "Sweep Authorization," which allowed Northstar to transfer funds directly from the entities' bank accounts automatically anytime a balance exceeded $5,000.  In their version of events, the "Northstar Sweeps" would transfer OA's, Autotac's, and Interclean's funds to OIL, and then from OIL directly to Northstar to pay down the outstanding line of credit.  *S&C*, ECF No. 64, PageID.1355-56.  Plaintiffs admit that there was a credit agreement, that it began as a $1 million line, and increased to $4 million, and that a "Sweep Authorization" was executed; they otherwise argue that there is no evidence supporting the remaining claims about how the credit line was used and the actual "sweeps" that allegedly occurred.  *See* ECF No. 68, PageID.2048.

The bulk of the present motions dispute the nature and purpose of various transfers between the Defendants and to Northstar Bank.

### B.    Facts specific to Plaintiff S&C

In the first half of 2022, OA contracted with Toyota Motor Manufacturing ("TMM") for the installation of the five robotics projects at three Toyota locations in Indiana, Kentucky, and Texas ("the Toyota Projects"). *S&C*, ECF No. 64, PageID.1356. OA in turn entered into a contract with S&C to perform millwright services on the Toyota projects. TMM paid OA in March of 2022 through February of 2023, but OA only paid S&C for some of the work under the contract. *Id.* at PageID.1356. The Moving Defendants allege that Northstar then swept the TMM payments, less any bills paid on the payment dates, to OIL, and then swept the OIL bank account and transferred all funds received by OIL on those days to pay down the revolving line of credit, less any expenses paid by OI and "net of transfers to other subsidiaries." *Id.*

Plaintiffs dispute that interpretation of events; in their view, the evidence in the record establishes that OA, under the control of OIL, transferred the funds received by TMM for work that OA and its subcontractors, including S&C, completed for Toyota, to OIL. They say that no evidence supports Defendants' claims that Northstar "swept up" these amounts, and elsewhere dispute the relevance of those claims regardless. In total, S&C alleges a total balance due on their account

7

with Oakland Automation is $710,096.11.  *S&C*, ECF No. 68, PageID.2052.

###### C.    Facts specific to Plaintiff *AP Electric*

The facts related to APE are similar to S&C, but differ slightly in the details of the underlying contract.  In the first half of 2022, OA contracted with Toyota Motor Manufacturing, Indiana, Inc. ("TMMI") for the installation of the TMMI East Base Interior Robot project at TMMI's planted located at 4000 Tulip Tree Drive, Princeton, Indiana. *APE*, ECF No. 74, PageID.1120.  OA in turn entered into a contract with APE to perform electrical services on the TMMI project in Indiana. OA paid APE $155,000 under that contract.

However, Oakland Automation then failed to pay APE a total amount of $325,663.43 for the following five invoices submitted to OA from July 19, 2022 until May 8, 2023.  *APE*, ECF No. 78, PageID.1854.

TMMI paid OA for the work performed in March, May, June, August, and December 2022, as well as in January and February 2023. As with S&C, the Defendants claim that Northstar then swept the TMMI payments, to OIL on that same day.  Northstar then swept the OIL bank account and transferred all funds received by OIL on those days to pay down the revolving line of credit, less any expenses paid by

8

OI and "net of transfers to other subsidiaries."  ECF No. 74, PageID.1120.

As in S&C, APE says that's not what happened.  In their view, OA, under the control of OIL, transferred the funds received from TMMI, for work that OA and APE completed for Toyota, to OIL.  APE disputes the explanation of Northstar's "sweep" of the funds on the grounds that Defendants attach no "documentary evidence to support" those allegations.  ECF No. 78, PageID.1851.

### D.   OA's Bankruptcy

On July 6, 2023, OA filed a voluntary petition for bankruptcy under chapter 7 of title 11 of the United States Code (the "Bankruptcy Code") in the District of Delaware.  OA listed one secured creditor, Northstar Bank, on Schedule D: Creditors Who Have Claims Secured by Property.  OA listed 150 creditors on Schedule E/F: Creditors Who Have Unsecured Claims, including S&C and APE.  Defendants' version of events is that, prior to filing for bankruptcy, OA liquidated its assets and allowed the funds to be swept to Northstar to pay down the outstanding balance on the Northstar line of credit.  *S&C*, ECF No. 64, PageID.1357.

On October 23, 2023, the Chapter 7 Trustee for OA's bankruptcy case issued his Chapter 7 Trustee's Report of No Distribution, certifying that OA's bankruptcy estate had been fully administered and requesting to be discharged from any further duties as trustee.  On November 30, 2023, OA's bankruptcy case was closed.

On July 6, 2023, Autotac also filed a voluntary petition for bankruptcy under chapter 7 of the Bankruptcy Code in the District of Delaware.  On October 23, 2023, the Chapter 7 Trustee for Autotac's bankruptcy case issued his Chapter 7 Trustee's Report of No Distribution, certifying that Autotac's bankruptcy estate had been fully administered and requesting to be discharged from any further duties as trustee.  On November 24, 2023, Autotac's bankruptcy case was closed.

### E.    Claims Brought Against Moving Defendants

Plaintiffs S&C and AP Electric bring identical counts against the relevant Defendants.  The remaining claims in both cases against the Moving Defendants are:

- Count VI for violations of Michigan's Uniform Voidable Transactions Act (MUVTA), Mich. Comp. Laws § 566.31 *et seq.*;

10

- Count VII for violations of Michigan's Building Contract Fund Act, Mich. Comp. Laws § 570.151 *et seq.*;

- Count VIII for statutory conversion, in violation of Mich. Comp. Laws § 600.2919a;

- Count IX for common law conversion;

- Count XI for Civil Conspiracy against all Defendants.

## II.    STANDARD OF REVIEW

When a party files a motion for summary judgment, it must be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A party asserting that a fact cannot be or is genuinely disputed must support the assertion by: (A) citing to particular parts of materials in the record...; or (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1). The standard for determining whether summary judgment is appropriate is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *State Farm Fire & Cas. Co. v. McGowan*, 421 F.3d 433, 436 (6th Cir. 2005) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S.

11

242, 251-52 (1986)). Furthermore, the evidence and all reasonable inferences must be construed in the light most favorable to the non-moving party. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). However, when the record contains "a videotape capturing the events in question," the court may not adopt a "version of the facts for purposes of ruling on a motion for summary judgment" that "blatantly contradict[s]" the asserted version of events such that "no reasonable jury could believe it." *Raimey v. City of Niles, Ohio*, 77 F.4th 441, 447 (6th Cir. 2023) (quoting *Scott v. Harris*, 550 U.S. 372, 380 (2007)). And the court must "nonetheless 'view any relevant gaps or uncertainties left by the videos in the light most favorable to the Plaintiff.'" *LaPlante v. City of Battle Creek*, 30 F.4th 572, 578 (6th Cir. 2022) (quoting *Latits v. Phillips*, 878 F.3d 541, 544 (6th Cir. 2017)).

Where the movant establishes the lack of a genuine issue of material fact, the burden of demonstrating the existence of such an issue shifts to the non-moving party to come forward with "specific facts showing that there is a genuine issue for trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). That is, the party opposing a motion for summary judgment must make an affirmative showing with proper

12

evidence and must "designate specific facts in affidavits, depositions, or other factual material showing 'evidence on which the jury could reasonably find for the plaintiff.'" *Brown v. Scott*, 329 F.Supp.2d 905, 910 (6th Cir. 2004). To fulfill this burden, the non-moving party need only demonstrate the minimal standard that a jury could ostensibly find in his favor. *Anderson*, 477 U.S. at 248; *McLean v. 988011 Ontario, Ltd.*, 224 F.3d 797, 800 (6th Cir. 2000). However, mere allegations or denials in the non-movant's pleadings will not satisfy this burden, nor will a mere scintilla of evidence supporting the non-moving party. *Anderson*, 477 U.S. at 248, 251.

## III. ANALYSIS

Despite the minor factual differences between these cases, the Moving Defendants' motions raise substantively similar legal arguments. Specifically, they argue 1) that Plaintiffs' veil-piercing claims are barred because they remain property of OA's bankruptcy estate, 2) OA's bankruptcy estate likewise bars prosecution of the fraudulent transfer claims, 3) the MBTFA does not apply to Plaintiffs' claims, 4) the MUVTA and conversion claims fail on the merits because Defendants were merely preferencing a secured creditor, and 5) Plaintiffs' civil conspiracy claim cannot lie without an underlying tort

13

claim. *AP Electric*, ECF No. 74, PageID.1112; *S&C*, ECF No. 64, PageID.1348. This case is before the court on the basis of diversity jurisdiction, 28 U.S.C. § 1332, and Plaintiffs' claims are based entirely on state law. Therefore, the court must apply the law of the forum state. *See Erie R.R. v. Tompkins*, 304 U.S. 64, 78 (1938); *Talley v. State Farm Fire & Cas. Co.*, 223 F.3d 323, 326 (6th Cir. 2000). The court takes these arguments in turn.

### A.    Alter Ego/Veil Piercing

In both motions, the Moving Defendants argue that the remedies involving veil piercing and alter ego liability are property of OA's bankruptcy estate and may not be pursued in this case absent abandonment. Plaintiffs do not respond to this argument on the merits, but note the court's prior ruling on their veil-piercing claims, and argue that the Moving Defendants improperly seek Rule 56 summary judgment on alter ego/piercing the corporate veil because they seek to sidestep this court's prior ruling.

The court agrees with Plaintiffs. As noted, the court previously dismissed the only count bringing the alter ego/veil piercing claims on Defendants' motion earlier in this case (and the breach of contract claim was only pled against OA, not Moving Defendants, *see AP Electric*, ECF

14

No. 32, PageID.261, *S&C*, ECF No. 31, PageID.431).  The court did so because "[i]t is well established that piercing the corporate veil is not itself a cause of action; it is a post-judgment remedy." *Seither & Cherry*, ECF No. 37, PageID.559; *AP Electric*, ECF No. 39, PageID.361 (citing *Brennan v. Nat'l Action Fin. Servs., Inc.*, No. 12-CV-10551, 2012 WL 3888218, at *3 (E.D. Mich. Sept. 7, 2012) (internal citations omitted)). The court noted that "plaintiffs may be able to bring a separate cause of action for piercing the corporate veil "when a judgment already exists against a corporate entity." *Seither & Cherry Quad Cities, Inc.*, 2024 U.S. Dist. LEXIS 188340, at *16 (citing *Gallagher v. Persha*, 315 Mich. App. 647, 662, (2016).

There is no count in play for veil piercing or alter ego liability, and the Moving Defendants were not included in Count I for breach of contract, so it is not clear what claim Defendants seek summary judgment on – other than that they seek to preempt the eventual claim for veil piercing.  But the theoretical future application of piercing the corporate veil as an equitable remedy, in the event that either plaintiff succeeds in obtaining a judgment against OA, cannot be decided here when no such claims appear to be currently at issue.  Defendants' motion for summary judgment on that issue is therefore denied.

15

## B. Effect of the OA Bankruptcy

As a general rule, any property listed in a debtor's bankruptcy schedules not otherwise administered at the time of the closing of a case is abandoned to the debtor. 11 U.S.C. § 554(c). But "[u]nless the court orders otherwise, property of the estate that is not abandoned under [section 554] and that is not administered in the case remains property of the estate." 11 U.S.C. § 554(d). The OA bankruptcy was closed, *see AP Electric*, ECF No. 74-12, PageID.1719, so all scheduled property was abandoned by the closure of the case; any unscheduled property, however, remains property of OA's bankruptcy estate. A threshold issue would bar several of Plaintiffs' claims: Defendants argue that Plaintiffs' fraudulent transfer claims remain property of OA's bankruptcy estate because they were not scheduled. So the court starts there.

Defendants say that Plaintiffs' MUVTA claim boils down to four specific transfers.[1] The court will return to the first three later, but for

---

[1] The court notes that whether this is true is the subject of a separate motion in limine. *See, e.g.*, *Seither & Cherry*, ECF No. 83. The court reserves judgment on that issue until consideration of the motion in limine that directly addresses that point. But for purposes of this opinion only, the court assumes that view is right and takes Defendants' arguments on their terms.

16

now, the fourth transfer, the "$1,000,000 Claim", is useful to center.

Transfers comprising the $1,000,000 claim were listed in OA's

statement of financial affairs, but not their "schedules," which

Defendants say means those transfers were not "scheduled" within the

meaning of 11 U.S.C. § 554(c). That provision states that "any property

scheduled under section 521(a)(1) of this title not otherwise

administered at the time of the closing of a case is abandoned to the

debtor[.]" Section 521(a)(1), in turn, requires a debtor to file, among

other things: (A) a list of creditors; and (B) unless the court orders

otherwise, (i) a schedule of assets and liabilities; (ii) a schedule of

current income and current expenditures; and (iii) a statement of the

debtor's financial affairs. The court disagrees with Defendants'

interpretation of these provisions.

While there seems to be a split of authority on the issue,[2] the court

did not find (and Defendants did not point to) any cases binding on this

court. And lacking binding direction, the court finds it more convincing

that, "[w]hile some bankruptcy courts have held that 'scheduled' in the

context of section 554(c) is limited to property disclosed on a piece of

---

[2] *See In re Hill*, 195 B.R. 147, 149 (Bankr. D.N.M. 1996) (collecting examples).

17

paper entitled 'schedule,' section 554(c) by its terms incorporates section 521(a)(1) without any such limitation." *See Osadon v. C&N Renovation, Inc.*, No. 05-17-00453-CV, 2018 Tex. App. LEXIS 3319, at *7-8 (Tex. App. May 9, 2018). Accordingly, "the 'scheduled' requirement in § 554(c) refers to all of the disclosures required in § 521(a)(1), including the debtor's statement of financial affairs." *United States ex rel. Fortenberry v. Holloway Group, Inc.*, 515 B.R. 827, 829 (Bankr. W.D. Okla. 2014) (citing *In re Hill*, 195 B.R. 147, 149-51 (Bankr. D. N.M. 1996)). Because the transfers comprising the "$1,000,000 Claim" were listed in OA's statement of financial affairs, any fraudulent transfer claims regarding that property were abandoned when the bankruptcy was closed.

The court assumes for purposes of this opinion that Plaintiffs' MUVTA claims are otherwise limited to what Defendants referred to as the "VS II Claim," the "Autotac Claim," and the "$500,000 Claim." *See* ECF No. 87, PageID.2401-02. Defendants argue that the specific transfers underlying these claims were not listed anywhere in OA's bankruptcy schedules, including the statement of financial affairs, and that appears to be true. However, Defendants did not discuss the effect of OA having scheduled Plaintiffs as "creditors" with unsecured claims

18

pursuant to 11 U.S.C. § 521(a)(1)(A), and also listed Plaintiffs' underlying legal actions in their statement of financial affairs (*S&C*, ECF No. 64-10, PageID.1889), and whether that means Plaintiffs' claims (and any transfers they claimed as fraudulent in these cases) were thus still "scheduled" and abandoned by closure of the bankruptcy case (even if these other transfers were not listed by OA).  Lacking guidance or any specific argument on this point, the court thinks it premature to opine on that sub-issue.

### C.    MUVTA (Count VI)

Count VI of both complaints alleges that all of the Defendants violated the Michigan Uniform Voidable Transactions Act ("MUVTA"), Mich. Comp. Laws § 566.31 *et seq.*  Specifically, Plaintiffs allege that OIB, Interclean, and OIL received transfers of assets, value or monies from Oakland Automation, while Oakland Automation was insolvent, and with intent to hinder, delay, and defraud the debtholders of the "consolidated company," Oakland Industries, including Plaintiffs.  *Id.*

MUVTA was "designed to prevent debtors from transferring their property in bad faith before creditors can reach it." *Dillard v. Schlussel*, 308 Mich. App. 429, 446 (2014).  MUVTA provides for two types of voidable fraudulent transfers: those with fraudulent intent (Mich.

Comp. L. § 566.34(1)(a)), and those which are deemed "constructively" fraudulent (Mich. Comp. L. §§ 566.34(1)(b) and 566.35(1)). *See Dillard*, 308 Mich. App. at 433; *Gold v. Wall (In re Wall)*, 661 B.R. 365, 377 (Bankr. E.D. Mich. 2024). The second type under § 566.34(1)(b) and § 566.35(1), commonly called constructive fraud, deems certain transactions fraudulent regardless of the creditor's ability to prove the debtor's actual intent, such as when a debtor transfers his assets when the debtor knew they would incur a substantial debt they would not be able to pay (§ 566.34(1)(b)), or when the creditor has a claim against the debtor but the debtor then transfers his assets and becomes insolvent or was insolvent at the time of the transfer (§ 566.35(1)). *See Caldwell Co. v. Yousif*, No. 23-cv-10976, 2025 U.S. Dist. LEXIS 41989, at *5-6 (E.D. Mich. Mar. 7, 2025). The second type of constructive fraud, an "insolvency transfer", applies only to transfers made after the creditor's claim arose. Mich. Comp. Laws § 566.35(1). Three elements of proof are required: (1) that the creditor's claim arose before the transfer, (2) the debtor was insolvent or became insolvent as a result of the transfer, and (3) the debtor did not receive reasonably equivalent value in exchange for the transfer. *Dillard*, 308 Mich. App. at 433.

20

This court has already held that Plaintiffs sufficiently alleged that they have a claim against OA, and that OA is a "debtor" within the meaning of MUVTA. *Seither & Cherry Quad Cities, Inc. v. Oakland Automation, LLC*, No. 23-11310, 2024 U.S. Dist. LEXIS 188340, at \*31-32 (E.D. Mich. Oct. 16, 2024). And the Moving Defendants are proper parties to that claim because they are transferees who allegedly hold an interest in the assets Plaintiffs seek. *Id.* at \*33.

Defendants now argue that the transfers at issue cannot be constructively fraudulent as a matter of law, because all the Defendants collectively did was preference a secured creditor, which definitionally does not violate MUVTA. Plaintiffs argue that this is a red herring – because Northstar's secured interest in *OIL*'s assets does not invalidate the illegality of the intermediary transfer from OA to OIL. *See* ECF No. 78, PageID.1864.

Defendants have a point. A transfer of monies pursuant to a higher-priority secured interest is not voidable under MUVTA. That reflects the common-law policy of the state of Michigan. *Haight v. Smith*, 178 Mich. 392, 398 (1914) ("It is not in this State unlawful for a corporation, although insolvent, to give preference to its creditor."); *Bank of Montreal v. J. E. Potts Salt & Lumber Co.*, 90 Mich. 345, 349

21

(1892) (referring to a "corporation [] converting its assets into money as rapidly as possible, and paying only certain of the creditors," noting that "It being insolvent, such action must result in the payment of some to the exclusion of others.  Such conduct, * * * although legal and proper before a bill is filed against it by a judgment creditor whose execution is returned unsatisfied, becomes improper after the filing of such bill.  From that time on, no unsecured creditor is entitled to a preference over others.").  And that long-standing policy was carried into effect in the text of MUVTA, "principally through its definitions of 'asset,' 'transfer,' and 'valid lien.'"  *PNC Equip. Fin., LLC v. Darin (In re Darin)*, 631 B.R. 301, 308 (Bankr. W.D. Mich. 2021).  As one Bankruptcy Court in this state explained the statutory basis for so concluding:

> A creditor's main remedy under MUVTA is avoidance of a "transfer," a term that "means every mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with an *asset* or an interest in an *asset*."  Mich. Comp. Laws § 566.31(q) (emphasis added).  The statute defines "asset" as "the property of a debtor," but significantly excludes from the definition "[p]roperty to the extent it is encumbered by a *valid lien*."  *Id.* § 566.31(b) (emphasis added).  Under that same section, a "'[v]alid lien' means a lien that is effective against the holder of a judicial lien subsequently obtained by legal or equitable process or proceedings."  *Id.* § 566.31(r).  This section imports the priority

22

> rules from non-MUVTA law, including Article 9
> of the Uniform Commercial Code.  So, as the
> syllogism goes, if the property at issue is not an
> asset because it is subject to a valid lien, a
> creditor has no remedy (and no claim) under
> MUVTA."

*Id.*

To put it in terms of the practical effect: "If a debtor's property is fully-encumbered, a transfer of that fully-encumbered property does not harm creditors[,]" and is not voidable under MUVTA, "because (1) the secured creditor's rights in the collateral already give that creditor access to the transferred property; and (2) unsecured creditors would not benefit from the avoidance of a transfer or recovery of encumbered property, because such property is earmarked for the secured party[.]" *PNC Equip. Fin.*, 631 B.R. at 308.

But still, the secured interest must be in the debtor's property, not the grantee's property, in order to make use of that defense.  The factual questions then become 1) did Northstar have a secured interest in OA's property (versus only OIL), 2) if yes, can APE and/or S&C prove their interests were higher priority, and finally, 3) if not, has Defendant carried their burden to show that they did in fact pay a secured creditor those monies?  As to the first, there appears to be no material dispute

23

that Northstar had a secured interest in OA's property. *See S&C*, ECF No. 64-4, PageID.1514, 1522 (loan agreement with OA, OIL, Northstar, and the other subsidiaries, referring to security agreement); ECF No. 64-11, PageID.1904 (bankruptcy petition listing Northstar as a secured creditor). As to the second, there is no indication that APE or S&C's contracts were secured interests (to the contrary, they are listed as unsecured creditors in OA's bankruptcy), and so were not higher priority. So the issue boils down to whether Defendant has proven, beyond material dispute, that all of the Toyota monies Plaintiffs seek were in fact swept up to the secured creditor, Northstar.

On that point, the court is not convinced. In their argument, Defendants cite no record evidence to prove that "OA simply paid one creditor over another." *See* ECF No. 74, PageID.1136. Even incorporating Defendants' statement of facts, however, the record is not undisputed. There are two relevant statements of fact:

> 20. Northstar then swept the TMMI payments, less any bills paid on the payment dates, to OIL on that same day. *See id.* (transfers to or from DDA account ending in 3508 is OIL). (citing Exhibit E – OA Bank Stmts; Exhibit F – Harvey Aff.).
>
> 21. Northstar then swept the OIL bank account and transferred all funds received by OIL on

24

> those days to pay down the revolving line of
> credit, less any expenses paid by OI and net of
> transfers to other subsidiaries.  *See* Exhibit G –
> OIL Bank Stmts (transfers to and from accounts
> ending in 5322 (Autotac), 3441 and 3557
> (Interclean), 3466 (OA), 5504 (VSII), and 6376
> (Northstar Line of Credit).

*AP Electric*, ECF No. 74, PageID.1120-21.

Plaintiffs admit that OA transferred funds to OIL, but otherwise disputes these statements in several ways.  First, they say there is no evidence showing that Northstar – rather than OA/OIL – directed the transfers from OA to OIL.  *See AP Electric*, ECF No. 78, PageID.1851. Second, they say there is no documentary evidence supporting the allegations that Northstar swept OIL's account, rather than OIL electing to transfer funds.  *See id.*  And third, they say there is no evidence showing that all funds received by OIL on those days – in other words, all of the Toyota monies – were swept up.

The court agrees that nothing in the bank statements shows who directed the transfers between the relevant accounts.  However, contrary to Plaintiffs' argument, it is not clear why these intermediary transfers matter under the MUVTA claim for purposes of this defense. Whether Northstar swept the account or OA/OIL deliberately moved the money out of Plaintiffs' reach to pay their secured creditor, the

25

result would be the same if one assumes that Northstar actually collected all the Toyota monies.  So while the reason for the transfer between OA and OIL is disputed, it is not material to the outcome of Plaintiffs' MUVTA claim for purposes of this opinion because Northstar had secured interests in both OA's and OIL's assets; if Northstar ended up with all the Toyota monies, that is no different than had they swept OA's account directly or had OA voluntarily paid them directly.

The issue of whether all of the Toyota monies were in fact completely swept up by Northstar is different.  The statements provided by the parties do not show a running total of OA's cash on hand in their checking account.  *See AP Electric*, ECF No. 64-6, PageID.1591-1745 (Exhibit E); ECF No. 64-8, PageID.1751-1807 (Exhibit G).  These roughly 200 pages of bank statements do not, on review, show clearly identifiable transactions matching in dollar amounts moving from Toyota to OA to OIL to Northstar.  Yet Defendants – who are seeking to assert the defense that they merely paid a secured creditor – bear the burden of proving that defense by the preponderance of the evidence, and bear the burden at summary judgment to prove that there is no genuine dispute on the facts of that defense.  *See Beck-Wilson v. Principi*, 441 F.3d 353, 360 (6th Cir. 2006).  Defendants essentially

26

handwave at their exhibits and state in conclusory fashion that they show that all the Toyota monies were swept up by Northstar – but do not explain their math or make any attempt at a serious accounting that tracks specific transactions. *See* ECF No. 74, PageID.1120-21 (citing "Exhibit E" and "Exhibit G" without page numbers or line numbers). Defendants must do more than point generally to these voluminous financial records or highlight certain payments to prove they are entitled to the benefit of this defense. The court is not required to engage in its own pen-and-paper accounting to try and guess at how Defendants arrived at their calculation. *See Knight Cap. Partners Corp. v. Henkel AG & Co., KGaA*, 903 F.3d 775, 780 n.1 (6th Cir. 2019) ("Judges are not like pigs, hunting for truffles that might be buried in the record.") (quoting citation omitted); *U.S. Bank Nat'l Ass'n v. Rohit Nanan*, No. 20-CV-849, 2022 U.S. Dist. LEXIS 188285, at *14 (E.D.N.Y. Oct. 14, 2022) ("Plaintiff cannot expect the Court to sift through its supporting documentation while engaging in guesswork to figure out how plaintiff reached the amounts stated in the accompanying Affidavit or plaintiff's other submissions.") (citation omitted, cleaned up). These bank statements may, in the end, show what Defendants say they do –

27

but Defendants must explain the point clearly to be entitled to judgment as a matter of law.

The court therefore **DENIES** Moving Defendants' Motions as to Count VI in both Complaints.

### D. MBTFA (Count VII)

The Michigan Building Contract Fund Act, otherwise known as the "Michigan Builders Trust Fund Act" ("MBTFA"), prohibits a building contractor or subcontractor from "retaining or using construction payments from a particular project until all laborers, subcontractors, and materialmen who worked on the project have been paid." *People v. Brown*, 239 Mich. App. 735, 738 (2000). A party must prove: "(1) the defendant is a contractor or subcontractor engaged in the building construction industry, (2) a person paid the contractor or subcontractor for labor or materials provided on a construction project, (3) the defendant retained or used those funds, or any part of those funds, (4) for any purpose other than to first pay laborers, subcontractors, and materialmen, (5) who were engaged by the defendant to perform labor or furnish material for the specific project." *Id.* (citing *DiPonio Const. Co. v. Rosati Masonry Co.*, 246 Mich. App. 43, 49 (2001)). The court has already found that the MBTFA covers the

28

type of work Plaintiffs performed.  *Seither & Cherry Quad Cities, Inc. v. Oakland Automation, LLC*, No. 23-11310, 2024 U.S. Dist. LEXIS 188340, at *44 (E.D. Mich. Oct. 16, 2024) ("the term 'building construction industry' is not meant to be read so narrowly as to exclude from its protection subcontractors who install large, industrial robotics fixtures in a vehicle manufacturing plant.").

Defendant now argues that 1) no moving Defendant received the funds at issue from Toyota, and so cannot be liable, 2) no Moving Defendant retained the funds at issue, because Northstar swept up all of those funds, and so the funds cannot be recovered from them, and 3) the MBTFA does not have extraterritorial effect with respect to out-of-state contractors performing services in a non-Michigan forum.  The court takes these in turn.

### 1)      Transferee Recipients of MBTFA Funds

Defendants first argue that none of the Moving Defendants were directly paid by Toyota because only OA was paid directly as the contractor on the projects.  Although Plaintiffs do not say so, they effectively concede that point.  *AP Electric*, ECF No. 78, PageID.1865 ("the record establishes that Toyota, through TEMA, paid OA . . . ."); *S&C*, ECF No. 78, PageID.1865 (same).  Although not clearly

29

explaining their theory, Plaintiffs appear to advance an alternative theory that Defendants can nonetheless be directly liable under the MBTFA as contractors.  *See*, perhaps, ECF No. 78, PageID.1865.  As best the court can tell, this is an extension of their general "alter ego" theory of liability, and argues that Moving Defendants received the MBTFA funds in their capacities as mere alter egos of OA.  But if that is the theory being advanced, support for that legal argument is left entirely undeveloped,[3] and the court does not address it further here.

However, that does not end the discussion, because as previously pointed out, transferees are also proper parties for an MBTFA claim: "[A]n entity or party claiming the status of a trust beneficiary can collect trust property from a transferee of the trustee only if three separate factors are established: the property transferred must in fact be trust property; the transferee must not be a bona fide purchaser for value; and the transferee must still be in possession of the trust property."  *Openings v. Fifth Third Bank*, No. 14-07940, 2016 Mich. Cir. LEXIS 151, *10 (Mich. Cir. Ct. 2016) (quoting *In re Williams Brothers Asphalt Paving Co*, 59 B.R. 71, 75 (Bankr. W.D. Mich. 1986)).  Setting

---

[3] And would seem to be inconsistent with Plaintiffs' argument that alter ego status is not at issue in this posture.

aside the alter ego theory, OIL and/or OIB are plausible defendants as recipients of trust funds.

### 2)   Effect of Northstar Sweeps

In response to that point, the Moving Defendants argue that they are no longer in possession of the trust property, because all funds were swept up by Northstar. *See* ECF No. 74, PageID.1137. As above, after review of Defendants' highlighted transactions and records, the court is unconvinced. As explained, Defendants' argument largely points in conclusory fashion at the voluminous bank records (which have highlighted transactions here and there), and say these show that all of the Toyota monies were swept up. But for example, take a couple of relevant transactions at random: ECF No. 64-6, PageID.1616, shows two withdrawals, for roughly $28,000 and $792,000 on 3/11/22 and 3/18/22, from OA's account to an account whose last four digits matches OIL's account.[4] OIL's account also shows outgoing transfers to an account called "Loan" on those same dates, but in different amounts ($16,700 on 3/11 and over $900,000 on 3/18). ECF No. 64-8, PageID.1786. While a fair reading of these transactions shows the

---

[4] And maybe more to the point, Plaintiffs do not dispute that the funds were transferred to OIL. *See AP* Electric, ECF No. 78, PageID.1866.

31

Toyota monies were transferred to OIL's account, the outgoing transfers

from OIL to "Loan" (presumably, Northstar) do not clearly correspond to

the prior transactions because they differ in their amounts by

significant margins.  Defendants do not offer an explanation of the

differences between these statements, nor do they explain what monies

OIL presently maintains, and so have not met their evidentiary burden

at summary judgment to show that these transfers constituted both a)

the *same* trust property paid by Toyota, or b) *all* of that trust property.[5]

Absent that evidence, a reasonable jury could find the evidence

indicates the Moving Defendants retained the funds paid by Toyota,

and the monies are recoverable as transferees of MBTFA trust property.

In reply, Defendants offer a somewhat distinct argument: that it is

Plaintiff's burden to prove that Defendants are still in possession of

those identifiable trust funds.  *See AP Electric*, ECF No. 80,

PageID.2308-09 (citing *Architectural Openings &, Access, Inc. v. Fifth*

---

[5] None of these transactions appear to involve OIB, which was included in this count in the complaint.  *See AP Electric*, ECF No. 32, PageID.269.  But neither set of parties address OIB directly in their briefs as separate from OIL, and because the court is denying summary judgment on this count, it thinks that distinction better suited for development or explanation at trial.  Interclean was not included in this count in the complaint, and the court does not understand their liability to be at issue.

*Third Bank*, No. 14-07940-CZB, 2016 WL 11970737, at \*3 (Mich. Cir.
Ct. May 19, 2016)).  The court reads that case slightly differently in this
posture: At summary judgment, it is Defendants' burden to bring
forward sufficient evidence to show all of those trust funds are not in
their possession.  *See Architectural Openings*, 2016 WL 11970737, at \*3
(granting summary judgment because "Fifth Third has made a
persuasive showing that all of those trust funds and much more money
than that flowed from Fifth Third" and so it was not in possession of
MBTFA funds).  And for the reasons explained, the court thinks that
question is a matter of genuine, material dispute.

### 3)      Extraterritorial effect of the MBTFA

Finally, Defendants argue that the MBTFA does not apply to this
case, which largely concerns payment for projects in Indiana.  The court
disagrees.  The general rule is that the MBTFA is assumed to have
extraterritorial reach.  As Plaintiffs point out in response: "The location
of the project is not relevant, . . . to the conduct regulated by the
MBTFA -- the focus of the statute is on the collection and misuse of
construction funds . . . ."  *Accu-Tech Corp. v. Jackson*, 352 F. Supp. 2d
831, 837 (E.D. Mich. 2005) (as in this case, the funds were collected and
possibly mishandled in Michigan by a Michigan entity for a

construction project in another state).  But a kind of "minimum contacts" test applies: "the Trust Fund Act requires sufficient contacts to the State of Michigan when it applies by its own force extraterritorially."  *Performance Contracting, Inc. v. Dynasteel Corp.*, 750 F.3d 608, 615 (6th Cir. 2014).

Defendant's reliance on *Dynasteel* (which ultimately found the Act did not apply) to show that the Act should not apply here is misplaced. While it is true that the Act requires sufficient contacts to Michigan, Defendants in this case are located in Michigan and received their payments here.  In *Dynasteel*, the defendant was not located in Michigan at all.  That "dispute involve[d] an out-of-state general contractor and an out-of-state subcontractor, where the parties remained at all times out-of-state in connection with the project, their contracts were executed out-of-state, their choice of law was out-of-state, the work was completed out-of-state, the funds were mishandled out-of-state, the payment plan was negotiated out-of-state, and the payment plan was executed out-of-state," and the only connection to Michigan was that "the work product was eventually shipped to Michigan, where it was installed by a third party."  *Id.* at 615. Similarly, Defendants' citation to *Behler-Young Co. v. Cousino (In re*

34

*Cousino)*, 364 B.R. 289, 295 (Bankr. N.D. Ohio 2006), is unavailing. In that case, for services and projects performed in Ohio, the defendant Ohio debtor's sole connection with the state of Michigan was his purchase of supplies from a Michigan corporation (which itself was not involved in the case), and that was not enough for the Act to apply. Defendants' physical presence in Michigan is readily distinguishable from an out-of-state purchase of supplies or an eventual third-party transaction.

True, the projects at issue in this case were in Indiana. But the funds were received by Defendants (located in Michigan) and allegedly mishandled in Michigan. This case is factually similar to *Accu-Tech*, where the funds were received and mishandled in Michigan for an out-of-state construction project, the plaintiff was a Georgia corporation, the defendant was a Michigan corporation, and the district court found the Act applied. The out-of-state subcontractors in this case remain protected by the MBTFA for their out-of-state work when the relevant funds were paid to a Michigan-based entity which is territorially subject to the Act.

Therefore, the court **DENIES** Moving Defendants' Motions as to Counts VII.

35

### E. Conversion (Counts VIII and IX)

Defendants next argue that the statutory and common law conversion claims should be dismissed. They first argue that they "never received any money from Plaintiff directly to which they had an affirmative obligation to return. They then argue that, contrary to the Court's previous ruling, the economic loss doctrine bars relief. *E.g.*, *AP Electric*, ECF No. 74, PageID.1139.

Defendant's first argument is, in entirety: "while OI received transfers from OA, those proceeds were immediately transferred to Northstar to pay down the revolving line of credit. It was not based on a fraudulent transfer, because the transfers paid down the debt owed to the senior secured lender." ECF No. 74, PageID.1139. Their second argument is that, contrary to the court's prior ruling, the economic loss doctrine applies to services contracts, not just the sale of goods. *Id.* Properly construed, this second argument is a motion for reconsideration of the court's order on their motions to dismiss. *See Oakland Automation*, 2024 LX 199739, at *49. So construed, it is untimely under the local rules. *See* E.D. Mich. LR 7.1(h)(2). But in any event, the argument does not address the court's separate and independent finding that "[i]f, as Moving Defendants argue, there is in

36

fact no contractual obligation between the Moving Defendants and Plaintiffs, then Moving Defendants' duty to return those monies allegedly fraudulently given to them is a separate and distinct duty from OA's own contractual duty." *Oakland Automation*, 2024 LX 199739, at *49-50. For example, the court cited the proposition that a person who receives fraudulently converted property but pays no consideration for it has an obligation to return it. *Id.* at *50 (citing 18 Am. Jur. 2d Conversion § 57). Likewise, when the property is taken from the fraudulent possessor by a third person with knowledge of the fraud, the common law imposes a duty on the third person to return the property to its rightful owner. 18 Am. Jur. 2d Conversion § 57. The court also noted that when the dispute involves money held in trust for another, the duties imposed by trust allow a conversion claim. *See, e.g.,* *Sudden Serv. v. Brockman Forklifts, Inc.*, 647 F. Supp. 2d 811, 815 (E.D. Mich. 2008) (when a dispute is over monies owed, conversion applies if the case involves money that is the "property of one party but held by another party (e.g., bank accounts, trusts, etc.) which is then wrongfully taken"). As a relevant example, the court pointed out that a duty under the MBTFA to retain any trust funds received from TMMI was a duty capable of grounding a conversion claim. *See Oakland*

37

*Automation*, 2024 LX 199739, at \*50 (citing *Int'l Indus. Contracting Corp. v. Sofir Italia s.r.l.*, No. 16-cv-13168, 2017 U.S. Dist. LEXIS 130395, at \*25 (E.D. Mich. Aug. 16, 2017),*Windrush Inc. v. Vanpopering*, No. 315958, 2015 Mich. App. LEXIS 1703, at \*21 (Ct. App. Sep. 10, 2015)).

In reply, Defendants say that assuming *arguendo* that the funds were MBTFA funds, Plaintiff cannot demonstrate that the alleged MBTFA funds can be identified as the precise dollars swept from OA's account that Northstar used to reduce OA's obligation on the revolving line of credit. *AP Electric*, ECF No. 80, PageID.2310 (citing *Dunn v. Bennett*, 303 Mich. App. 767, 778 (2014), *Architectural Openings &, Access, Inc. v. Fifth Third Bank*, No. 14-07940-CZB, 2016 WL 11970737, at \*3 (Mich. Cir. Ct. May 19, 2016)). Because this argument was brought in reply, and Plaintiffs have not had the opportunity to respond, in this posture it would premature to weigh in on this argument.[6] The court **DENIES** Moving Defendants' Motions as to Counts VIII and IX.

---

[6] However, the court points out that the Northstar sweeps are, in essence, an affirmative defense being brought by the Moving Defendants, which they (not Plaintiffs) bear the burden to prove at summary judgment. And for the reasons

## F.    Conspiracy (XI)

Finally, Defendants seek summary judgment on Count XI of Plaintiffs' complaints for Civil Conspiracy, because there is no underlying tort. As described above, in the instant order the court does not grant Defendants' motion as to MUVTA (Count VI), the MBTFA (Count VII), or of statutory and common law conversion (Counts VIII and IX). The court therefore **DENIES** Moving Defendants' Motions as to Count XI in both cases.

## IV.   CONCLUSION

For the reasons described in the above opinion, the court **DENIES** Moving Defendants' Motions for Summary Judgment.

**SO ORDERED**.

Date: March 30, 2026             s/F. Kay Behm
                                 F. Kay Behm
                                 United States District Judge

---

explained above, Defendants have not presented sufficient evidence to show that they did in fact pay all the Toyota monies to a secured creditor – they thus fail to meet their evidentiary burden even if their view of the law is correct.